**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

---

**In re: CCA Recordings 2255 Litigation**,
　　　　　　　　　　**Petitioners,**

**v.**　　　　　　　　　　　　　　　　**Case No. 19-cv-2491-JAR**

　　　　　　　　　　　　　　　　**(This Document Relates to Case No. 14-**
　　　　　　　　　　　　　　　　**20067-JAR-1,** *United States v. Gregory*
　　　　　　　　　　　　　　　　*Rapp***, and Case No. 18-2117-JAR-JPO,**
　　　　　　　　　　　　　　　　*Gregory Rapp v. United States***)**

**United States of America.**
　　　　　　　　　　**Respondent.**

---

**MEMORANDUM AND ORDER**

　　　Before the Court is Petitioner Gregory Rapp's Amended Motion to Vacate and Discharge

with Prejudice under 28 U.S.C. § 2255 (Doc. 690).[1]  Petitioner claims that the government

violated the Sixth Amendment by intentionally and unjustifiably becoming privy to his attorney-

client communications, and asks the Court to reject the government's request to dismiss this

action on procedural grounds and find that he has made a sufficient showing to warrant an

evidentiary hearing.  He also challenges the voluntariness of his guilty plea and claims that

counsel was ineffective.  As a remedy, he asks the Court to vacate his judgment with prejudice to

refiling or, alternatively, to reduce his custodial sentence by approximately 50% and vacate his

term of supervised release.  Petitioner subsequently filed a second Motion for Leave to Amend

his § 2255 motion to allege a discrete post-plea Sixth Amendment intentional intrusion violation

---

[1] Unless otherwise specified, citations prefaced with "Doc." refer to filings and docket entries in the underlying criminal case, No. 14-20067-JAR-1.  Citations prefaced with "*CCA Rec. Lit.* Doc." Refer to filings and entries in this consolidated Master case, No. 19-cv-2491-JAR-JPO.  With the exception of *United States v. Carter*, Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019) ("*Black* Order"), citations to filings in Case No. 16-20032-JAR are prefaced with "*Black*, Doc."

(Doc. 881 in Case No. 19-2491).  The matter is fully briefed, and the Court is prepared to rule.

For the reasons explained below, the Court grants Petitioner leave to amend.  Petitioner's § 2255

motion, as amended, is denied without an evidentiary hearing.  Petitioner is also denied a

certificate of appealability.

## I.  Background

### A.  Procedural History

On December 19, 2015, Petitioner was charged in a Fourth Superseding Indictment with

conspiracy to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846 and

§ 841(b)(1)(B) (Count 1); conspiracy to commit money laundering, in violation of 18 U.S.C.

§ 1956(h) (Count 2); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Counts

3–12).[2]

On March 4, 2016, Judge Carlos Murguia conducted an in limine and pretrial hearing in

anticipation of the jury trial scheduled to start the following Monday, March 7, 2016.[3]  That

same day, Petitioner pled guilty to all twelve counts in a written plea agreement.[4]  In exchange

for Petitioner's guilty plea, the government agreed not to file a notice of prior felony drug-related

conviction under 21 U.S.C. § 851, which would have subjected Petitioner to a mandatory ten-

year sentence on Count 1.[5]

Based on at total offense level of 38 and a criminal history category of II, the Presentence

Investigation Report ("PSIR") calculated Petitioner's applicable Guidelines range at 262 to 327

---

[2] Doc. 237.

[3] Doc. 334.

[4] Doc. 338.

[5] *Id.* ¶ 3.

months' imprisonment.[6]  His offense level was calculated as follows: base offense level of 26

because the conspiracy to distribute marijuana involved approximately 660.7 kilograms of

marijuana; two-level increase because Petitioner possessed a firearm; two-level increase because

Petitioner maintained premises for storing and cultivating marijuana; two-level increase because

Petitioner was convicted of money laundering under 18 U.S.C. § 1956; four-level increase

because Petitioner was an organizer or leader of the criminal activity; and two-level increase

because Petitioner attempted to obstruct or impede the administration of justice.[7]

Notwithstanding these calculations, on March 22, 2017, the parties entered into a

sentencing agreement intended to avoid imposition of a sentence within this Guidelines range.[8]

The parties jointly proposed that Petitioner be sentenced to 120 months' imprisonment on Counts

1 through 12, to be served concurrently, followed by four years of supervised release; no fine; a

mandatory special assessment of $100 per count of conviction; and forfeiture of certain

property.[9]  As part of the sentencing agreement, Petitioner agreed not to object to the PSIR or

request a variance from the 120-month recommendation.[10]  Petitioner also agreed to waive his

right to appeal or collaterally attack the components of the sentence imposed in this case, except

in the event the Court imposed a sentence in excess of the sentence recommended by the parties

under Rule 11(c)(1)(C).  In exchange, the government agreed not to object to the PSIR or to file

any additional charges against Petitioner arising out of the facts forming the basis of the Fourth

Superseding Indictment.[11]  The sentencing agreement specifically reserved Petitioner's right to

---

[6] Doc. 482 ¶ 225.

[7] *Id.* ¶¶ 172–80.

[8] Doc. 489.

[9] *Id.* ¶ 2.

[10] *Id.* ¶ 4.

[11] *Id.* ¶ 5.

collaterally attack his conviction and sentence based on subsequent claims of ineffective assistance of counsel and prosecutorial misconduct.[12]

On March 22, 2017, Judge Murguia accepted the PSIR's calculations regarding Petitioner's total offense level, and found that his advisory Guidelines sentencing range was 262 to 327 months' imprisonment.[13]  Even so, the court accepted the recommendations proposed by the parties in their sentencing agreement and sentenced Petitioner to 120 months' imprisonment on Counts 1 through 12, to be served concurrently, followed by a four-year term of supervised release, and ordered forfeiture of Petitioner's property.[14]  In its Statement of Reasons, the court acknowledged that the sentence constituted a variance from the advisory Guidelines sentencing range and was below that range based on the parties' joint sentencing agreement.[15]  Petitioner did not file a direct appeal.

Petitioner was represented by Richard Johnson in the underlying criminal proceedings. On March 12, 2018, Petitioner filed a *pro se* § 2255 motion raising claims of ineffective assistance of counsel.[16]  The Court appointed the Federal Public Defender ("FPD") to represent Petitioner in his § 2255 proceedings on July 17, 2018.[17]  On February 20, 2019, the FPD filed an amended § 2255 motion on Petitioner's behalf, asserting four grounds for relief: (1) the government violated the Sixth Amendment by intentionally and unjustifiably intruding into his attorney-client communications by obtaining recordings of telephone calls and soundless videos;

---

[12] *Id.* ¶ 10.

[13] Doc. 492.

[14] Doc. 491.

[15] Doc. 492.   The criminal proceedings were reassigned to the undersigned after Judge Murguia resigned from the bench.  Doc. 699.

[16] Doc. 580, 581-1.

[17] Standing Order 18-3.

(2) his plea is invalid and in violation of due process because it was not a knowing, voluntary, and intelligent act; (3) trial counsel was ineffective because he failed to advise Petitioner about investigating and potentially litigating a Sixth Amendment violation prior to entering a plea, failed to advise Petitioner regarding his appellate and postconviction rights as a result of entering into the plea agreement, and failed to expressly reserve Petitioner's right to appeal or collaterally attack his conviction in the plea agreement; and (4) counsel was ineffective when he failed to file a motion for return of property under Fed. R. Crim. P. 41, and failed to move to withdraw Petitioner's guilty plea and dismiss the indictment based on prosecutorial misconduct. The court dismissed Petitioner's *pro se* § 2255 motion as redundant after the FPD filed the amended motion.[18]

Petitioner was released from custody on March 31, 2022.[19]

### B.      The *Black* Investigation and Order

The Court assumes the reader is familiar with its ruling in *United States v. Carter* ("*Black* Order") that precipitates the § 2255 motion before the Court. That comprehensive opinion was intended to provide a record for future consideration of the many anticipated motions filed pursuant to § 2255 and is incorporated by reference herein. The Court does not restate the underlying facts and conclusions of law in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.

Petitioner seeks relief based on events documented in the *Black* case and investigation, which included audio recordings of telephone conversations and soundless video recordings of meetings between attorneys and their clients who were detained at CCA. The government

---

[18] Doc. 693.

[19] Federal Bureau of Prisons, *Inmate Locator*, https://www.bop.gov/inmateloc/ (last visited November 20, 2023).

admits that it obtained videos from CCA in connection with the *Black* case, which focused on

drug and contraband trafficking inside CCA.  The government's possession of these recordings

came to light in August 2016, when then-Special Assistant United States Attorney ("SAUSA")

Erin Tomasic and AUSA Kim Flannigan accused defense attorney Jacquelyn Rokusek of

"jeopardiz[ing] their investigation" in *Black* based on information they claimed to have gleaned

from the video recordings of meetings between Rokusek and Petitioner's co-defendant, Richard

Dertinger.[20]  The defense also discovered that the United States Attorney's Office for the District

of Kansas ("USAO") had routinely obtained CCA recorded attorney-client phone calls, and that

it did so without notice to the attorneys, clients, or courts.[21]

Once notified of the video and audio recordings, this Court ordered (1) all local federal

detention facilities to cease recording attorney-client meetings and phone calls;[22] (2) the video

and audio recordings in USAO custody to be impounded;[23] and (3) the government to preserve

its computer hard drives.[24]  By October 11, 2016, the Court had appointed a Special Master to

assist in what the Court termed "Phase I and Phase II" of the Court's investigations, that is, to

determine the number of recordings possessed by the government and how to index and

segregate them, and to identify privileged or confidential information within those recordings.[25]

---

[20] *Black* Order at 70–80.

[21] *Id.* at 29–30.

[22] *Black*, Doc. 253 at 3.

[23] *Id.* at 3, 12 ("The Court subsequently issued a clawback order directing the government to gather and surrender to the Court all audio recordings in its possession, in the possession of investigative agencies, and in the possession of other defendants who had received them in discovery.").

[24] *Id.* at 40.  At the September 7, 2016 hearing in *Black*, "[t]he Court ordered the government to retain and preserve all of the hard drives as well as all of the hardware necessary to access the information on the hard drives." *Id.*

[25] *Black*, Doc. 146 (Appointment Order).

The government did not cooperate with the Special Master's investigation, however, and its failure to cooperate ultimately resulted in a lengthy delay in this Court's ability to rule on these issues.  Finally, despite the delay associated with the government's failure to cooperate and its litigation efforts challenging the propriety of the Special Master's investigation, the Court conducted a full evidentiary hearing on all pending matters in *Black* in October and November 2018.

On August 13, 2019, the Court issued the *Black* Order, which addressed, *inter alia*, the governing standard for an intentional-intrusion Sixth Amendment claim in the Tenth Circuit.[26] The Order discussed the elements required to prove a per se violation of the Sixth Amendment under the Tenth Circuit's decision in *Shillinger v. Haworth*,[27] which held that a per se Sixth Amendment violation occurs when: (1) there is a protected attorney-client communication; (2) the government purposefully intruded into the attorney-client relationship; (3) the government becomes "privy to" the attorney-client communication because of its intrusion; and (4) the intrusion was not justified by any legitimate law enforcement interest.[28]  Once those elements are established, prejudice is presumed.[29]

The Court further held that a finding of purposeful intrusion into the attorney-client relationship necessarily requires a threshold showing that the recordings were protected attorney-client communications.[30]  While recognizing that the attorney-client privilege is not a right guaranteed by the Sixth Amendment, the Court applied principles relating to the privilege as a

---

[26] *Black* Order at 145–62.

[27] 70 F.3d 1132 (10th Cir. 1995).

[28] *Black* Order at 162 (citing *Shillinger*, 70 F.3d at 1142).

[29] *Id.*

[30] *Id.* at 163.

framework for this showing that the recordings between petitioners and counsel were protected communications under the Sixth Amendment. With respect to the audio recordings, the Court determined that the following threshold showings must be made after review and verification by the FPD: (1) the telephone recording exists, and (2) a given call contains protected attorney-client communication, i.e., communication that relates to legal advice or strategy sought by the client.[31] This threshold showing requires an affidavit from defense counsel confirming that the nature and purpose of the call(s) were within the ambit of protected communication, including but not limited to defense preparation, plea negotiations, or review of discovery.[32]

With respect to the video recordings, the Court determined that the following threshold showings must be made after review and verification by the FPD: (1) the video of the attorney-client meeting exists; and (2) the quality of the non-verbal communication in the video is sufficient to confirm communication between the detainee and counsel.[33] This threshold showing also requires an affidavit from defense counsel confirming that the nature and purpose of the meeting(s) were within the ambit of protected communication.[34]

### C.   Proceedings in Consolidated Master Case

The *Black* Order reassigned all *Black*-related § 2255 motions pending before other judges in the District to the undersigned for determination of the merits of petitioners' Sixth Amendment claims and for consolidated discovery.[35] It was this Court's intent that by reassigning the habeas actions to the undersigned and consolidating the cases for discovery, the

---

[31] *Id.* at 166.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *CCA Rec. Lit.*, Doc. 1.

process for seeing over 100 cases to completion would be streamlined for all parties.  Like the *Black* Order, the Court assumes the reader is familiar with the proceedings in the consolidated master case that precipitates the matter before the Court, and does not restate the underlying facts in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.

Relevant here, the government argued in response to many of petitioners' motions that the assertion of a per se Sixth Amendment violation under *Shillinger* was foreclosed by *Tollett v. Henderson*.[36]  In that case, the Supreme Court held that petitioners are barred from raising "independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."[37]  After the Court ordered supplemental briefing on the issue, multiple petitioners argued that *Tollett* did not apply to their claims, that *Shillinger*'s presumption of prejudice satisfied *Tollett*, and that it did not matter whether the alleged Sixth Amendment violation occurred before or after a petitioner's guilty plea for purposes of the *Shillinger* analysis.[38]

On January 18, 2021, the Court rejected petitioners' arguments, concluding that the rule in *Tollett* procedurally barred petitioners who alleged pre-plea Sixth Amendment violations from advancing those claims.[39]  The Court held that each petitioner who claims a pre-plea Sixth Amendment violation is held to the applicable standard for showing his plea was involuntary,

---

[36] 411 U.S. 258 (1973).

[37] *Id.* at 267; *see CCA Rec. Lit.*, Doc. 588 at 55–56.

[38] *See* Doc. 602; *CCA Rec. Lit.*, Doc. 729 at 2–7, 12–19.

[39] *Id.*, Doc. 730 at 39.

and gave petitioners time to consider whether to seek leave to amend their motions to withdraw their pleas.[40]

Petitioners filed a motion to reconsider the Court's order, arguing, *inter alia*, that the Court should presume a Sixth Amendment violation occurred *both* pre- and post-plea, starting May 17, 2016.[41]  The Court rejected petitioners' argument, observing that "until their motion to clarify and reconsider, petitioners collectively took the same approach to their individual Sixth Amendment claims that did not address the timing issues that the government argues alter or end the course of certain categories of claims."[42]  The Court further rejected petitioners' attempts to "recast their continuing-violation theory as advancing 'dual allegations,'" describing it as "an attempted end-run around *Tollett* and its progeny and inconsistent with that rule and the authority cited by the Court."[43]

In order to "set petitioners on their way," however, the Court clarified that "[a]ny petitioner who has a good-faith basis to allege an individualized and specific post-plea violation must seek leave to amend his § 2255 motion."[44]  The Court stressed, however, that by giving petitioners additional time to seek leave to amend their motions, it neither predicted nor guaranteed the outcome of any such individual petitioner's request.[45]  Six petitioners, including Mr. Rapp, moved for leave to amend their motions to assert that they have a good-faith basis to claim a post-plea, pre-sentence Sixth Amendment violation.

---

[40] *Id.* at 40–41; *see Hill v. Lockhart*, 474 U.S. 52, 58–60 (1985) (adopting two-part test for ineffective assistance of counsel claim in the plea context: "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.").

[41] *Id.*, Doc. 756.

[42] *Id.*, Doc. 784 at 2.

[43] *Id.* at 11.

[44] *Id.*

[45] *Id.* at 19.

On December 10, 2021, the Court issued an order that concluded petitioners in the temporal category of claims who alleged Sixth Amendment violations that occurred post-plea or conviction but before sentencing could not rely on *Shillinger*'s per se rule.[46]  Instead, Petitioners in this temporal category must demonstrate prejudice, that is, "a realistic possibility of injury to [the defendant] or benefit to the [government]."[47]

### D.   Tenth Circuit Decisions

Two recent decisions by the Tenth Circuit Court of Appeals control this Court's analysis of consolidated petitioners' claims.  The Court first discusses the ruling on pre-plea violation claims, then turns to post-plea/pre-sentence violation claims.

### 1.   *Spaeth*

Petitioner is one of many petitioners in this consolidated matter who allege pre-plea Sixth Amendment violation claims, including Matthew Spaeth, whose pre-plea claim was dismissed by this Court as foreclosed by the rule in *Tollett*.[48]  In that case, the United States Supreme Court rejected a pre-plea constitutional challenge where the defendant failed to show that the violation rendered his guilty plea involuntary and unknowing.[49]  Many of these petitioners declined the opportunity afforded by the Court to amend their § 2255 motions to seek relief under *Tollett* or to allege a post-plea violation, and acknowledged that by doing so, they rendered their pre-plea

---

[46] *Id.*, Doc. 1034.

[47] *Id.*; *see Shillinger v. Haworth,* 70 F.3d 1132, 1142 (10th Cir. 1995) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977)).

[48] 411 U.S. 258, 266 (1973).

[49] *Id.*

Sixth Amendment claims vulnerable to dismissal.[50]  The Court deferred ruling on Petitioner's § 2255 motion pending the outcome of Mr. Spaeth's appeal.[51]

On June 12, 2023, the Tenth Circuit Court of Appeals affirmed this Court's ruling in *Spaeth*.[52]  The Tenth Circuit ruled: (1) the carve-out provision in Spaeth's unconditional standard plea agreement did not constitute a waiver of the government's right to raise, or create an exception to, the rule of law in *Tollett*, and because Spaeth had not met his burden under *Tollett* to vacate his unconditional guilty plea, this Court did not err in ruling that *Tollett* bars his Sixth Amendment challenge;[53] (2) Spaeth's reliance on the per se Sixth Amendment violation rule in *Shillinger* is misplaced because that case did not concern *Tollett*'s guilty-plea situation and "has nothing to do with whether a guilty plea is voluntary or knowing";[54] and (3) *Tollett* precludes Spaeth from challenging his sentence based on an alleged pre-plea Sixth Amendment violation.[55]  The court concluded:

> We abide by several principles that the Supreme Court made transparent 50 years ago.  When a defendant voluntarily and knowingly pleads guilty, the defendant acknowledges that unconstitutional conduct preceding the guilty plea is irrelevant to the admission of factual guilt.  As a result, we do not assess the merits of pre-plea constitutional claims but instead ask whether ineffective assistance of counsel caused defendants to enter their guilty pleas involuntarily and unknowingly.  *Tollett* and its progeny tell us how to answer that question: challengers must show ineffective assistance of plea counsel.  Because Spaeth does

---

[50] *CCA Rec. Lit.*, Doc. 840; *see Hill v. Lockhart*, 474 U.S. 52, 58–60 (1985) (adopting two-part test for ineffective assistance of counsel claim in the plea context: "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.").

[51] *See Spaeth v. United States*, No. 19-2413-JAR-JPO, Docs. 3, 7, 8; *CCA Rec. Lit.*, Docs. 730, 785, 922.

[52] *United States v. Spaeth*, 69 F.4th 1190 (10th Cir. 2023).  The mandate issued August 21, 2023.

[53] *Id.* at 1204–08.

[54] *Id.* at 1211.  The court declined to decide "what effect any per se presumption of a Sixth Amendment violation might have in applying the *Hill* prejudice standard—a reasonable probability that the defendant would not have pleaded guilty absent the deficient performance."  *Id.*

[55] *Id.* at 1212–13.

not even contend that his counsel performed deficiently, or that such deficient performance prejudiced him by depriving him of a trial right he would have chosen, we conclude that Spaeth's § 2255 motion must be dismissed.[56]

### 2.    *Orduno-Ramirez*

The Court's December 10, 2021 Order concluded petitioners in the temporal category of claims who alleged Sixth Amendment violations that occurred post-plea or conviction but before sentencing could not rely on *Shillinger*'s per se rule.[57]  Instead, Petitioners in this temporal category must demonstrate prejudice, that is, "a realistic possibility of injury to [the defendant] or benefit to the [government]."[58]

The Tenth Circuit Court of Appeals affirmed this Court's decision in another § 2255 proceeding raising a similar Sixth Amendment violation claim involving video recordings.  In *United States v. Orduno-Ramirez*, the Tenth Circuit declined to categorically extend a conclusive presumption of prejudice to post-plea or -conviction intrusions into attorney-client communications.[59]  After noting this Court held that the petitioner must show prejudice in such cases, the Tenth Circuit did "not decide which party bears the burden because the Government has shown that Mr. Orduno-Ramirez has not been prejudiced, and he does not contend otherwise."[60]  Nevertheless, the court found that the government showed that the intrusion did not cause Mr. Orduno-Ramirez prejudice, and Orduno-Ramirez did not contend that he was prejudiced, relying instead on the presumption of prejudice in *Shillinger*.[61]  The court further

---

[56] *Id.* at 1213.

[57] *Id.*, Doc. 1034.

[58] *Id.*; *see Shillinger v. Haworth,* 70 F.3d 1132, 1142 (10th Cir. 1995) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977)).

[59] 61 F.4th 1263, 1273–77 (10th Cir. 2023) (discussing *Shillinger*, 70 F.3d at 1142).

[60] *Id.* at 1276.

[61] *Id.* at 1277.

found that the government showed that the lead prosecutor did not view the videos, the soundless video recordings provided no strategic value to the prosecution, and the record reveals no irregularity in the petitioner's sentencing proceedings.[62]

The Tenth Circuit also denied Orduno-Ramirez's request to order supplemental briefing on the burden of proof question.[63]  In a separate related case on appeal, however, the court recently agreed to address the issue of "[w]hether the district court erroneously required [Petitioner] to demonstrate prejudice to establish his Sixth Amendment claim."[64]

### E.        Recordings in this Case

While Petitioner was detained at CCA, he spoke on the phone with his attorney, Johnson. He also met with Johnson in visitation rooms at CCA.  Some of these phone calls and meetings were recorded, as detailed below.

### 1.        Audio Recordings

Upon arriving at CCA, Petitioner signed several documents acknowledging that telephone calls he made from CCA may be monitored and recorded and advising him that calls with his attorney were subject to being monitored unless he followed the privatization procedure in place to make an unmonitored call.  While Petitioner was detained at CCA, he called his attorney to discuss his case.

As detailed in the *Black* Order, Tomasic was the prosecutor in Petitioner's case, and Dertinger was one of his co-defendants.[65]  As previously noted, that case overlapped with the *Black* case; cooperators in the *Rapp* case provided Tomasic with information about Dertinger

---

[62] *Id.*

[63] *Id.* at 1277 n.24.

[64] *United States v. Valdez*, No. 22-3025 (10th Cir. Sept. 12, 2023).

[65] *Black* Order at 92.

and the CCA investigation.[66]  In 2016, Kansas Bureau of Investigation Agent Jeff Stokes informed Tomasic that he heard two attorney-client calls between Petitioner and Johnson.[67] Tomasic sought advice from the Professional Responsibility Officer at the USAO, who advised her that since she did not intend to use the calls at trial or sentencing, the safest approach was to disclose the calls to counsel with no need to involve the court at that time.[68]  When Tomasic notified Johnson that Agent Stokes had discovered his calls with Rapp, she characterized it this way: "CCA inadvertently included at least three calls between you and your client," dismissing it as an anomaly.[69]  Despite these circumstances, and without notice to counsel, Tomasic again requested Petitioner's calls, this time after his guilty plea and as part of the underlying *Black* investigation.

In the *Black* case, the government surrendered to the Court recordings and derivative evidence of audio calls from CCA that were in its possession, including the recordings of the calls in Petitioner's case.  The FPD reviewed five recordings of Petitioner speaking with Johnson from CCA between June 1, 2015 to December 4, 2015.  Pursuant to the Court's Order, Petitioner provided a privilege log detailing the claimed protected communications, verifying that during the phone conversations, Petitioner discussed matters "relat[ing] to legal advice or strategy" with Johnson.[70]  Petitioner also provided a sworn declaration from Johnson stating that the telephone conversations related to legal advice or strategy; that while he knew or believed that these calls were subject to monitoring or recording, he did not consent to such monitoring or recording and

---

[66] *Id.*

[67] *Id.*

[68] *Id.* at 92–93.

[69] *Id.* at 93.

[70] *CCA Rec. Lit.*, Doc. 205-2, at 162–65.

was not informed and was unaware that attorney-client phone calls could be privatized; and that he did not know or believe these calls could be distributed or made available to the USAO or its agents, nor did he consent to such distribution or availability.[71]  Petitioner supplemented the record with a sworn statement addressing the issue of waiver with respect to his audio-recordings claim.[72]  The Securus Call Access Logs confirm that each call listed on Petitioner's privilege log was accessed at least once before Petitioner pleaded guilty, and were accessed again on at least one other occasion after he entered his guilty pleas.

After the government objected to Petitioner's privilege log, the Court reviewed the audio

In addition to Tomasic, Petitioner was prosecuted by AUSA Flannigan, who denies that she listened to the recording during the pending underlying case.[73]  Flannigan also confirmed that audio recordings of phone calls Petitioner made from CCA were obtained as part of the prosecution of the case and that all five calls referenced in Petitioner's privilege log were turned over to defense counsel as part of discovery between September 10, 2015 and January 20, 2016.[74]  Tomasic withdrew from the case on May 16, 2017, and was terminated after she admitted listening to the calls in a separate criminal case.[75]

After the government objected to Petitioner's privilege log, the Court reviewed the audio and video recordings *in camera*.  At the beginning of each call, a recorded preamble states the following language: "This is a collect call from an inmate at CCA-Leavenworth Detention Center.  This call is subject to recording and monitoring."  There is no discussion of this preamble between Petitioner and Johnson in any of the calls listed in the privilege log, nor any

---

[71] *Rapp*, No. 18-2117-JAR, Doc. 11-1.

[72] *Id.*, Doc. 10-1.

[73] *Id.,* Doc. 3-1.

[74] *Id.*

[75] *Black* Order at 98.

during their conversation.  As set out in the privilege log, Petitioner and Johnson discussed legal advice or strategy, including challenging Petitioner's detention order, his likely criminal history score, reasons for a separatee order, and a plea offer.

### 2. Video Recordings

On August 13, 2019, this Court released the video recordings to the FPD as a result of the *Black* investigation.[76]  The FPD, along with defense counsel, reviewed four video recordings of Petitioner meeting with Johnson in person at CCA on February 25, March 1, March 2, and April 7, 2016.[77]

Pursuant to the Court's Order, Petitioner provided a privilege log detailing the claimed protected video communication, verifying that during these meetings, Petitioner discussed matters "relat[ing] to legal advice or strategy" with Johnson.[78]  After the government objected to Petitioner's privilege log, the Court reviewed the video recordings *in camera*.  As set out in the privilege log, these meetings ranged from 1.5 to nearly four hours, and show Petitioner and Johnson or another member of the defense team reviewing documents and taking notes.  AUSA Flannigan denies viewing the video recordings.[79]

## II. Discussion

### A. Sixth Amendment Intentional Intrusion Claim

### 1. Motion for Leave to Amend

Petitioner's amended § 2255 motion generally alleges that a Sixth Amendment violation occurred when the government obtained and listened to his attorney-client calls sometime after

---

[76] *Id.* at 165.

[77] *CCA Rec. Lit.,* Doc. 205-2 at 162–63.

[78] *Id.*

[79] *Rapp v. United States*, No. 18-2117-JAR, Doc. 3-1.

July 11, 2014, while he was confined at CCA.  More specifically, Petitioner alleges that at least twelve attorney-client phone calls were accessed by the government during the course of his prosecution, several of which were accessed multiple times, and that the government made at least twelve documented production requests for Petitioner's CCA calls, even after the government was aware that CCA was inadvertently including phone calls with Rapp and Johnson in its productions.  Indeed, on January 22, 2016, Tomasic wrote to Johnson to advise that at least three attorney-client calls had been obtained and accessed by Agent Stokes. Petitioner's amended motion challenges both his plea and resulting conviction and his sentence due to alleged pre-plea government misconduct.  In the wake of the Court's ruling that pre-plea claims are foreclosed under *Tollett*, Petitioner seeks leave to amend his claim once again to allege a discrete post-plea violation challenging only his sentence or term of supervised release.

Fed. R. Civ. P. 15(a)(2) governs a motion to amend a § 2255 motion if it is made before the one-year limitations period for filing a § 2255 petition has expired.[80]  Under Rule 15(a)(2), "a movant may file an amended § 2255 motion at any time during post-conviction proceedings with leave of court."[81]  An amendment only relates back to the original pleading, however, when "the amendment asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out— or attempted to be set out—in the original pleading."[82]  Without a claim relating back, a motion under § 2255 must be brought within a year from "the date on which the judgment of conviction becomes final."[83]

---

[80] *United States v. Ohiri*, 133 F. App'x 555, 559 (10th Cir. 2005).

[81] *United States v. Roe*, 913 F.3d 1285, 1296 (10th Cir. 2019) (citing Fed. R. Civ. P. 15(a)(2)).

[82] Fed. R. Civ. P. 15(c)(1)(B).

[83] 28 U.S.C. § 2255(f)(1).

For untimely § 2255 amendments made outside of the one-year window, a claim will only relate back if, "by way of additional facts, [the amendment] clarifies or amplifies a claim or theory in the original motion."[84]   However, if the "proposed amendment . . . seek[s] to add a new claim or to insert a new theory into the case," it does not relate back to the original motion.[85] "[T]he operative question for" relation-back "is whether 'the original and amended [motions] state claims that are tied to a common core of operative facts.'"[86]   "The answer to that question will often turn on whether the newly asserted claim would have had to be pleaded as a discrete claim under Section 2255 Rule 2(b) if it was set out in the original § 2255 motion."[87]

Here, Petitioner's motion for leave to amend was filed outside the one-year window. Thus, to relate back to his original § 2255 motion, the amendment must not "add a new claim or . . . insert a new theory into the case."[88]   The Court finds that it does not.  Petitioner's original § 2255 motion alleged the prosecution team became privy to his protected recordings at some point during the course of his prosecution.  Although Petitioner alleged the government initially obtained his recorded calls before he pled guilty, he consistently maintained the government could have become privy to those calls either before or after his plea.  His proposed amendment states that he is now electing to allege that the intrusion occurred post-plea, which is similar in both time and type to his original allegation.  Thus, because the proposed amendment serves to narrow the more generalized assertions he previously made, it relates back to his first amended § 2255 motion.  Accordingly, the Court grants Petitioner's motion for leave and will proceed to

---

[84] *Roe*, 913 F.3d at 1296 (quoting *United States v. Espinoza-Saenz*, 235 F.3d 501, 505 (10th Cir. 2000)).

[85] *Id.*

[86] *Id.* at 1298 (alteration in original) (quoting *United States v. Trent*, 884 F.3d 985, 992–93 (10th Cir. 2018)).

[87] *Id.*

[88] *Id.* at 1296 (quoting *Espinoza-Saenz*, 235 F.3d at 505).

analyze his audio recordings claim as asserting a post-plea, pre-sentence Sixth Amendment violation.[89]

### 2.    Post-plea, Pre-Sentence Violation

The recorded meetings between Petitioner and Johnson took place between February 25 and April 7, 2016.  Three of these meetings occurred before Petitioner entered a guilty plea on March 4, 2016, and before he was sentenced on March 22, 2017.  The Court has clarified that the government did not have possession of and access to the video recordings until May 17, 2016, and it gave up possession when it disgorged the videos to the Court on August 9, 2016.[90]  Thus, any alleged Sixth Amendment violation stemming from the video recordings could not have occurred until after Petitioner's plea but before he was sentenced.

Although *Orduno-Ramirez* left open the question of whether the petitioner must show prejudice or whether the government must show lack of prejudice, the Court finds that Petitioner has not been prejudiced in this case even if the burden is on the government.  While the December 10, 2021 Order held that Petitioner bears the burden to show prejudice resulting from the intentional intrusion into his attorney-client communications, the government introduced evidence and arguments showing that he suffered no prejudice.  As previously noted, defense counsel had possession of all five audio calls prior to Petitioner's guilty plea and sentencing agreement.  And, as was the case in *Orduno-Ramirez*, the government submitted an affidavit from the lead prosecutor stating that at no time during her involvement in the case did she listen to any audio recordings or view any video recordings of Petitioner meeting with counsel at CCA.

---

[89] Because Petitioner relied on the per se prejudice rule in *Shillinger* and did not attempt to meet the applicable *Tollett* standard for showing that ineffective assistance of counsel caused him to enter his plea involuntarily and unknowingly, the decision in *Spaeth* would compel dismissal of his original pre-plea intentional intrusion claim challenging his conviction as well as any challenge to his sentence based on that pre-plea violation. *See United States v. Spaeth*, 69 F.4th 1190, 1204–13 (10th Cir. 2003).

[90] *See CCA Rec. Lit.*, Doc. 784 at 13.

More critically, Petitioner entered into a binding sentencing agreement and was sentenced consistent with that agreement.  The government's discretion or capacity to prejudice Petitioner was curtailed by the specific terms of the sentencing agreement.  The 120-month sentence was less than half of the applicable Guidelines range of  262 to 327 months' imprisonment and avoided a mandatory, consecutive term on the dismissed conspiracy charge.  Thus, the only governmental conduct that had any effect on sentencing was its offer of a binding sentencing agreement that allowed Petitioner to avoid a 22-year sentence.  Notably, Petitioner does not seek to set aside the sentencing agreement or challenge the knowing and voluntary nature of that agreement.

Even assuming the government bears the burden of proving lack of prejudice, it has met that burden because the record reveals no irregularity in or threat to the reliability or fairness of Petitioner's sentencing proceedings, where he received the sentence he bargained for in his sentencing agreement.  Because the government has shown the intrusion did not cause prejudice—and Petitioner does not contend that he was actually prejudiced—there is no Sixth Amendment violation and no ground for relief under § 2255.[91]

## B.    Knowing and Involuntary Plea

Petitioner argues that the government's pre-plea intentional intrusion violation rendered his plea involuntary.  Alternatively, he argues that his plea was involuntary because when he pled guilty in March 2016, he was not aware that his attorney-client meetings were being video recorded.

---

[91] *See Orduno-Ramirez*, 61 F.4th 1263, 1266 (10th Cir. 2023).  The Court does not reach the government's alternative argument that Petitioner's motion is subject to dismissal on timeliness or procedural default grounds.

### 1.    Pre-plea Violation

Petitioner first argues that the government's pre-plea intentional intrusion violation rendered his plea involuntary.  This claim is foreclosed by the amended claim, which drops the Sixth Amendment intentional intrusion challenge to Petitioner's plea and conviction and instead limits his challenge to his sentence.  As previously noted, Petitioner's pre-plea claim is also precluded by *Tollett*, as reaffirmed in the Tenth Circuit's ruling in *Spaeth*.[92]

### 2.    Government's Possession of Video Recordings

Petitioner acknowledges that counsel was aware that the government had obtained at least three of his attorney-client calls prior to his guilty plea and received the other two calls as part of discovery.  Nevertheless, Petitioner argues that when he pled guilty in March 2016, he was not aware that his attorney-client meetings were being video recorded, and that he lacked the factual basis to argue in support of withdrawing his plea because the government chose to hide critical information.  The government argues that, even if Petitioner did not know about the video recordings before he entered his guilty plea, that lack of knowledge did not make his plea involuntary.  The government is correct.

To find a guilty plea is voluntarily and knowingly entered into, the record must establish the petitioner had a full understanding of the consequences of his plea and the charges against him.[93]  As the Tenth Circuit recently reaffirmed in *Spaeth*, the Supreme Court has rejected the notion that lack of awareness or knowledge of a particular defense, even if constitutionally grounded, necessarily renders a guilty plea involuntary.[94]  In *Tollett*, the Court refused to find

---

[92] *See supra*, Section I.D.1.

[93] *See Boykin v. Alabama*, 395 U.S. 238, 243 (1969).

[94] *United States v. Spaeth*, 69 F.4th 1190, 1200–02 (10th Cir. 2023) (discussing *Tollett v. Henderson*, 411 U.S. 258, 265 (1973)).

that the defendant's guilty plea was rendered involuntary based on a constitutional claim that he discovered after he pled guilty; namely, that he was indicted by an unconstitutionally-selected grand jury in violation of his Fourteenth Amendment due-process rights.[95]  The Court stated, "[a] guilty plea, voluntarily and intelligently entered, may not be vacated because the defendant was not advised of every conceivable constitutional plea in abatement he might have to the charge, no matter how peripheral such a plea might be to the normal focus of counsel's inquiry."[96]  Instead, "[t]he focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea."[97]  The Tenth Circuit explained that *Tollett* and its progeny require a petitioner to demonstrate whether ineffective assistance of counsel caused him to enter a guilty plea involuntarily and unknowingly.[98]

Thus, whether Petitioner knew about a constitutional claim involving the government's possession of the video recordings is not the focus when determining the voluntariness of Petitioner's guilty plea.  Instead, the ruling in *Spaeth* makes clear that a petitioner who enters a plea of guilty on the advice of counsel may only attack the voluntary and intelligent character of the plea by showing that trial counsel's representation fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's errors, the petitioner would not have pled guilty, but would have insisted on going to trial instead.[99]  Petitioner's challenge to the voluntariness of his plea is denied on this ground.

---

[95] 411 U.S. at 260–61.

[96] *Id.* at 267.

[97] *Id.* at 266.

[98] *Spaeth*, 69 F.4th at 1213.

[99] *Id.* at 1203 (citing *Hill v. Lockhart*, 474 U.S. 52 , 57 (1985)).

### C.   Ineffective Assistance of Counsel

#### 1.   Standard

Section 2255 entitles a federal prisoner to relief if the court finds that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or [is] otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack."[100] The court must hold an evidentiary hearing on a § 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."[101]  A § 2255 petitioner must allege facts that, if proven, would warrant relief from his conviction or sentence.[102]  An evidentiary hearing is not necessary where the factual allegations are contradicted by the record, inherently incredible, or when they are conclusions rather than statements of fact.[103]

The Sixth Amendment guarantees that "[i]n all criminal prosecution, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."[104]  A successful claim of ineffective assistance of counsel must meet the two-pronged test set forth in *Strickland v. Washington*.[105]  First, a defendant must show that his counsel's performance was deficient in that it "fell below an objective standard of reasonableness."[106]  To meet this first prong, a defendant

---

[100] 28 U.S.C. § 2255(b).

[101] *United States v. Galloway*, 56 F.3d 1239, 1240 n.1 (10th Cir. 1995) (quoting 28 U.S.C. § 2255(b)).

[102] *In re Lindsey*, 582 F.3d 1173, 1175 (10th Cir. 2009).

[103] *See Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir. 1995) ("[T]he allegations must be specific and particularized, not general or conclusory"); *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (rejecting ineffective assistance of counsel claims that are merely conclusory in nature and without supporting factual averments).

[104] U.S. Const. amend. VI; *see Kansas v. Ventris*, 556 U.S. 586, 590 (2009).

[105] 466 U.S. 668 (1984).

[106] *Id.* at 688.

must demonstrate that the omissions of his counsel fell "outside the wide range of professionally competent assistance."[107]  This standard is "highly demanding."[108]  Strategic or tactical decisions on the part of counsel are presumed correct, unless they were "completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy."[109]  In all events, judicial scrutiny of the adequacy of attorney performance must be strongly deferential: "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[110]  Moreover, the reasonableness of the challenged conduct must be evaluated from counsel's perspective at the time of the alleged error, and "every effort should be made to 'eliminate the distorting effects of hindsight.'"[111]

Second, a defendant must also show that her counsel's deficient performance actually prejudiced her defense.[112]  To prevail on this prong, a defendant "must show that there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different."[113]  A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome."[114]  This, in turn, requires the court to focus on "the question whether counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair."[115]

---

[107] *Id.* at 690.

[108] *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

[109] *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (quotation and citations omitted).

[110] *Strickland*, 466 U.S. at 689.

[111] *Edens v. Hannigan*, 87 F.3d 1109, 1114 (10th Cir. 1996) (quoting *Strickland*, 466 U.S. at 689).

[112] *Strickland*, 466 U.S. at 687.

[113] *Id.* at 694.

[114] *Id.*

[115] *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

A defendant is entitled to the effective assistance of counsel during plea negotiations.[116] "The performance prong of *Strickland* requires a defendant to show that counsel's representation fell below an objective standard of reasonableness."[117]  To show prejudice in the guilty plea context, the defendant must establish "that 'there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and [would have] insisted on going to trial.'"[118]

In all events, a defendant must demonstrate both *Strickland* prongs to establish a claim of ineffective assistance of counsel, and a failure to prove either one is dispositive.[119]  "The performance component need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'"[120]

### 2.    Application

Petitioner broadly alleges that Johnson was ineffective because: (1) he failed to advise Petitioner about investigating and potentially litigating a Sixth Amendment intentional intrusion violation prior to entering a plea, failed to advise Petitioner regarding his appellate and postconviction rights as a result of entering the plea agreement, and failed to expressly reserve Petitioner's right to appeal or collaterally attack his conviction in the plea agreement; and (2) he

---

[116] *Lafler v. Cooper,* 566 U.S. 156, 162–63 (2012).

[117] *Id.* at 163 (internal quotation marks omitted).

[118] *Heard v. Addison*, 728 F.3d 1170, 1176 (10th Cir. 2013) (quoting *Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985)).

[119] *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

[120] *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 697 (1984)); *see also Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) ("This court can affirm the denial of habeas relief on whichever *Strickland* prong is the easier to resolve.").

failed to file a motion for return of property, and failed to move to withdraw Petitioner's guilty plea and dismiss the indictment based on prosecutorial misconduct.

First, to the extent Petitioner's allegations involve failure to take certain actions regarding his Sixth Amendment intentional intrusion claim, such arguments either lack merit or are effectively abandoned, as these claims necessarily involve allegations of a pre-plea violation.[121] Petitioner focuses on the results in other cases, including co-defendant Dertinger, where the parties entered into plea agreements of effectively time-served sentences after counsel filed Rule 41 motions seeking return of their attorney-client recordings.  In this case, however, the recordings of Petitioner's CCA calls with Johnson were turned over by the government prior to his plea and sentencing agreement.  Johnson states in his affidavit that he believed Tomasic when she told him the attorney-client calls had been inadvertently obtained when she turned them over.[122]  And although he suspected the government had viewed the videos of his meetings with Petitioner, Judge Murguia denied his request for additional time to investigate and file objections to the PSIR until the Special Master could complete his investigation and he could assess whether Petitioner's Sixth Amendment rights had been violated.[123]  Because he did not foresee the *Black* investigation concluding before Petitioner's sentencing date, Johnson advised him to enter into the favorable sentencing agreement with the government.[124]  Under these circumstances, the Petitioner has not shown, nor can the Court find in hindsight, that Johnson's representation, which is evaluated from counsel's perspective at the time of the alleged error, fell outside the range of professionally competent assistance.

---

[121] *See United States v. Orange*, 447 F.3d 792, 797 (10th Cir. 2006) (citation omitted) ("If the omitted issue is without merit, then counsel's failure to raise it is not prejudicial, and thus is not ineffective assistance.").

[122] Doc. 690-2.

[123] *Id.*

[124] *Id.*

Even if counsel misjudged the viability of the potential Sixth Amendment-related claims, however, Petitioner has not alleged, much less shown, that counsel's decisions prejudiced him. As noted, when a defendant claims his attorney provided ineffective assistance in connection with the decision to accept a plea bargain, the *Strickland* prejudice prong has a particular meaning: "[T]he defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."[125] Reviewing whether such a reasonable probability existed in a given case involves a "holistic inquiry into all of the 'factual circumstances surrounding the plea to determine whether the petitioner would have proceeded to trial,'" including assessment of "'objective' facts specific to a petitioner, such as his age, the length of the sentence he faced under the terms of the plea deal, the prospect of minimizing exposure to other charged counts, and so on."[126]  Further, proof of prejudice requires a petitioner to show that a decision to go "to trial would have been objectively 'rational under the circumstances.'"[127]

At a minimum, Petitioner must provide some explanation why he would have rationally taken the risk of going to trial.  Petitioner provides no such explanation.  While he might have a stronger argument if he were serving a term of imprisonment of between 262 and 327 months, as the PSIR calculated, Petitioner has served the agreed-upon sentence of 120 months and is currently serving the four-year term of supervised release.  Thus, he cannot show prejudice and his claims of ineffective assistance of counsel are denied on these grounds.

---

[125] *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

[126] *Heard v. Addison*, 728 F.3d 1170, 1183 (10th Cir. 2013) (quoting *Miller v. Champion*, 262 F.3d 1066, 1072 (10th Cir. 2001)).

[127] *Id.* at 1184 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010)).

Likewise, Petitioner's claim that counsel failed to advise him regarding his appellate and postconviction rights as a result of entering the plea agreement falls short.  A knowing and voluntary waiver of the statutory right to appeal or to collaterally attack a conviction is generally enforceable.[128]  "[T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it."[129]  When deciding whether a waiver of collateral attack rights was knowing and voluntary, reviewing courts must consider two main factors: "whether the language of the plea agreement states that the defendant entered the agreement knowingly and voluntarily," and whether there was "an adequate Federal Rule of Criminal Procedure 11 colloquy."[130]

Here, both factors favor a finding that Petitioner knowingly and voluntarily waived his right to collaterally attack his conviction on appeal or in these collateral proceedings.  While the plea agreement lacked a waiver provision, Petitioner ignores the existence and impact of the sentencing agreement in this case, which incorporated and modified the plea agreement.  In paragraph 10 of the sentencing agreement, Petitioner represented that he "knowingly and voluntarily waives any right to appeal or collaterally attack any matter in connection with this prosecution, his conviction, or the components of the sentence herein."[131]

Further, the court conducted a thorough colloquy with Petitioner at both the change-of-plea and sentencing hearings, which is an "important safeguard that protects defendants from

---

[128] *United States v. Chavez-Salais*, 337 F.3d 1170, 1172 (10th Cir. 2003); *United States v. Cockerham*, 237 F.3d 1179, 1181 (10th Cir. 2001).

[129] *United States v. Ruiz*, 536 U.S. 622, 629 (2002).

[130] *United States v. Hahn*, 359 F.3d 1315, 1325 (10th Cir. 2004) (en banc) (citations omitted).

[131] Doc. 489 ¶ 10.

incompetent counsel or misunderstandings," and "insure[s] that defendants understand the consequences of a guilty plea."[132]  The court reviewed the terms of the plea agreement with Petitioner at his change of plea hearing.[133]  During the colloquy, Petitioner told the court that he had read the written plea agreement, that he had reviewed it carefully with his counsel, and that he understood the consequences of pleading guilty to all twelve counts under the plea agreement.[134]  As noted, there was no waiver of appeal and collateral attack provision in the hastily-drafted plea agreement, which was subsequently included in the sentencing agreement.

The court also reviewed the terms of that agreement with Petitioner at the sentencing hearing.[135]  The court revisited the terms of the plea agreement and the PSIR, which counsel confirmed he had reviewed with Petitioner.  Counsel then explained that pursuant to the sentencing agreement, Petitioner waived all objections to the PSIR, which Petitioner confirmed.[136]  After noting the PSIR calculated the advisory Guidelines range at 262 to 327 months' imprisonment, the court exercised its discretion to accept the sentencing agreement and the proposed 120-month sentence.  The court specifically reviewed the waiver provision of paragraph 10 of the sentencing agreement with Petitioner and explained that, pursuant to paragraph 10, Petitioner was agreeing to give up most of his rights to appeal and to collaterally attack the conviction or sentence through a habeas proceeding.[137]  The Court asked if he understood, and Petitioner replied yes.  Accordingly, the record belies Petitioner's claim that counsel failed to adequately advise him regarding his waiver of the right to appeal or collaterally

---

[132] *Fields v. Gibson*, 277 F.3d 1203, 1214 (10th Cir. 2002) (citations omitted).

[133] Plea Hrg. Tr., Doc. 683.

[134] *Id.* at 5–6.

[135] Sent. Hrg. Tr., Doc. 700.

[136] *Id.* at 5.

[137] *Id.* at 12–15.

attack his conviction.  Had Petitioner misunderstood or been misinformed about the nature and extent of the waiver, Judge Murguia's discussion would have alerted him to that fact.  Any claim of prejudice also falls short, as any pre-plea violation claim is precluded by *Tollett* and Petitioner received the agreed-upon sentence.  This claim is denied.

## III.    Certificate of Appealability

Rule 11 of the Rules Governing Section 2255 Proceedings states that the Court must issue or deny a certificate of appealability ["COA"] when it enters a final order adverse to the applicant.  "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[138]  To satisfy this standard, the movant must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[139]  Although the Court condemns the government's conduct, for the reasons stated above, the Court finds that Petitioner has not made this showing and, therefore, denies a certificate of appealability as to its ruling on his § 2255 motion.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Gregory Rapp's Motion for Leave to Amend (Doc. 881 in Case No. 19-2491) is **granted**;

**IT IS FURTHER ORDERED** that Petitioner's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. 2255, as amended (Doc. 690) is **denied without an evidentiary hearing**.  Petitioner is also denied a certificate of appealability.

**IT IS SO ORDERED.**

---

[138] 28 U.S.C. § 2253(c)(2).

[139] *Saiz v. Ortiz,* 392 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Tennard v. Dretke,* 542 U.S. 274, 282 (2004)).

Dated: <u>December 8, 2023</u>

<u> S/ Julie A. Robinson</u>
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE